IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

KAANAPALI TOURS, LLC,,           )     CIVIL 11-00555 LEK-RLP
                                 )
          Plaintiff,             )
                                 )
     vs.                         )
                                 )
STATE OF HAWAII DEPARTMENT OF    )
LAND AND NATURAL RESOURCES,      )
BOARD OF LAND AND NATURAL        )
RESOURCES, ET AL.,               )
                                 )
          Defendants.            )
_____  )


**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

          Before the Court is Plaintiff Kaanapali Tours, LLC's
("Plaintiff") Motion for Preliminary Injunction ("Motion"), filed
on September 30, 2011.  Defendants the State of Hawaii Department
of Land And Natural Resources ("DLNR"), the Board of Land and
Natural Resources ("the Board"), William J. Aila, Jr., in his
official capacity as Chairman of the Board, Edward R. Underwood,
in his individual and official capacity, and Nicholas Giaconi, in
his individual and official capacity (all collectively
"Defendants") filed their memorandum in opposition on
December 13, 2011, and Plaintiff filed its reply on
December 20, 2011.  This matter came on for hearing on
January 3, 2012.  Appearing on behalf of Plaintiff were
Robert Frame, Esq., and Mark Hamilton, Esq., and appearing on
behalf of Defendants was Daniel Morris, Esq.  Janice Nolan and

Amy Sutherland, Plaintiff's owners, were also present.  After
careful consideration of the Motion, supporting and opposing
memoranda, and the arguments of counsel, Plaintiff's Motion is
HEREBY DENIED for the reasons set forth below.

### BACKGROUND

On September 13, 2011, Plaintiff filed the instant
action against Defendants DLNR, the Board, William J. Aila, Jr.,
in his official capacity as Chairman of the Board ("Defendant
Aila"), Edward R. Underwood, in his individual and official
capacity ("Defendant Underwood"),and Nicholas Giaconi, in his
individual and official capacity ("Defendant Giaconi").[1]  The
Complaint alleges, in pertinent part:

> 8.   On or about December 21, 2009, Defendant
> DLNR re-instated boating commercial use permit No.
> M-05 to Kaanapali Tours, LLC which at the time was
> owned by Kyle Bebee.  The vessel on the permit,
> ALII NUI, was a catamaran.  On or about March 31,
> 2010, Permit M-05 which belonged to Kaanapali
> Tours, LLC, was transferred along with Kaanapali
> Tours, LLC to Janice Nolan and Amy Sutherland.  At
> this time the permit was renewed and the ownership
> of Plaintiff changed; both were authorized by DLNR
> conditioned on payment of a $15,000 transfer fee,
> which was paid.  At that time, according to
> Defendant DLNR, all permit terms remained as set
> forth in the then-current permit, including the
> ability of Plaintiff to utilize either a monohull
> or multihull vessel and to carry up to 49
> passengers.

---

[1] According to the Complaint, Defendant Underwood is the
Administrator of DLNR's Division of Boating and Ocean Recreation
("DOBOR"), which regulates boating facilities and the
recreational use of the State's waters.  Defendant Giaconi is the
Maui District Manager of DOBOR.  [Complaint at ¶¶ 2, 4-5.]

9.   Permit No. M-05 was renewed by Plaintiff on or about March 31, 2011.  Defendant Underwood approved this renewal and Defendant DLNR accepted payment of fees for the renewal.  At all relevant times Plaintiff properly paid monthly permit fees to Defendant DLNR and Defendant DLNR accepted payment of these monthly permit fees.

10.   In reliance on Permit No. M-05, Plaintiff commissioned a catamaran vessel, QUEEN'S TREASURE, to be designed, manufactured and delivered to Plaintiff's place of business in Kaanapali, Maui to be operated for commercial purposes consistent with the terms of Permit No. M-05.  The cost of designing, manufacturing and delivering this vessel exceeded $1,000,000.00.  Plaintiff took possession of the vessel on or about May 27, 2011, and the vessel was delivered to Plaintiff's place of business on July 12, 2011.  Plaintiff is informed and believes the vessel complies in all respects with the regulations issued by DOBOR pertaining to commercial catamarans.

11.   In May 2011, Plaintiff learned Defendant DLNR had concerns with the validity of Permit No. M-05 when informed by Defendant Giaconi the Permit was forged.  On or about May 26, 2011 Plaintiff learned Defendant DLNR intended to cancel Permit No. M-05.  The grounds for cancelling Plaintiff's permit were purportedly: (1) a failure to attain minimum gross receipts, (2) a failure to submit evidence regarding a failure to attain minimum gross receipts and (3) a business transfer made prior to minimum continuous commercial operation of one year. . . .

[Complaint at pg. 3.]  Further, on or about August 3, 2011, Plaintiff learned that DLNR/DOBOR was taking the position that "M"-type permits were for monohulls only and that the use of a catamaran, including the Queen's Treasure, was not authorised on an "M"-type permit.  [Id. at ¶ 12.]

Plaintiff alleges that, in spite of their prior statements and actions, DLNR, Defendant Underwood, and Defendant

Giaconi have wrongfully refused to allow Plaintiff to operate the Queen's Treasure on Commercial Use Permit No. M-05 ("the Permit").  Plaintiff therefore has allegedly suffered and continues to suffer substantial damages.  Plaintiff asserts that it is on the brink of insolvency and that Defendant's actions threaten Plaintiff with irreparable harm.  [Id. at ¶¶ 13-14.]

The Complaint alleges the following claims: a claim seeking preliminary and permanent injunctive relief preventing Defendants from invalidating the Permit and requiring Defendants to allow Plaintiff to operate the Queen's Treasure under the Permit ("Count I"); denial of due process ("Count II"); a claim for declaratory relief stating that the Permit is valid and that the Queen's Treasure can be added to the inventory of vessels that Plaintiff can operate under the Permit ("Count III"); equitable estoppel ("Count IV"); denial of equal protection ("Count V"); negligence ("Count VI") and intentional interference with prospective business advantage ("Count VII").

In the instant Motion, Plaintiff contends that it meets all of the requirements for a preliminary injunction.  Plaintiff argues that it is likely to succeed on the merits of its due process claim because it has a property interest in the Permit, which Defendants have denied the use of without an opportunity to be heard.  Plaintiff also argues that it is likely to prevail on

the merits of its state law claims.

In support of its Motion, Plaintiff submits, *inter alia*: the Permit, renewed on December 21, 2009 with the Alii Nui as the vessel of record ("December 2009 Permit"); the Permit, dated March 31, 2010, with the Big Kahuna as the vessel of record ("March 2010 Permit"); the Permit, renewed on or around March 22, 2011 with the QT as the vessel of record ("March 2011 Permit"); a letter dated May 26, 2011 from Defendant Underwood regarding Defendants' intent to cancel the Permit based on the minimum gross receipts and business transfer issues; and various other correspondence setting forth other reasons for restricting the Permit, including that the Permit should not have been issued because the catamaran wait list had been jumped and there were already ten permitted catamarans for the area. [Motion, Aff. Of Robert G. Frame ("Frame Aff."), Exhs. A, F, G, M, O (July 7, 2011 email exchange), P (July 13, 2011 email).] The May 26, 2011 letter stated that DOBOR would be asking the Board to cancel the Permit and that Plaintiff would be notified of the date and time of the Board meeting at which the matter would be discussed. [Id., Exh. M.] Plaintiff, however, was never notified of any Board meeting addressing the matter, and it has not had the opportunity to contest the restriction of the Permit at either a Board meeting, hearing, or proceeding before an administrative law judge. [Frame Aff. at ¶ 16.]

In their memorandum in opposition, Defendants emphasize
that there are only five monohull permits for vessels that engage
in commercial activities where passengers embark and disembark at
Kaanapali beach and only ten permits for catamarans conducting
commercial operations out of Kaanapali beach.  Further,
Plaintiff's existing Permit is for a specific vessel, a sixteen-
foot, inflatable zodiac named the QT.  According to Defendants,
Plaintiff sought to revise the Permit to substitute the Queen's
Treasure, a sixty-four foot, thirty ton catamaran, for the QT.

Defendants argue that Plaintiff has no protected
property interest in switching the permitted vessel because:
there are four other persons on the Kaanapali catamaran wait list
before Ms. Nolan; [Mem. in Opp., Aff. of Daniel A. Morris
("Morris Aff."), Exh. C at 2;] Plaintiff was never told that it
could substitute the much larger Queen's Treasure for the QT; the
substitution of the vessels identified in permits requires DLNR
authorization; and Plaintiff has not engaged in any commercial
activity for the past two years, in violation of Haw. Rev. Stat.
§ 200-10's requirement of minimum revenues to maintain boating
permits.

Defendants point out that, dating back to the 1970s,
Kellam Bros., Inc. ("Kellam Bros.") owned the Permit and used it
to operate monohull vessels until it failed to pay necessary fees
in 2009.  DLNR cancelled the Permit in 2009, but reinstated it in

favor of one of Kellam Bros.' partners, Kyle Bebee, who sold his interest in the Permit to Plaintiff. [Morris Aff., Exhs. D & E.] The reinstated Permit was issued to Plaintiff for the Alii Nui in December 2009, but it was not signed by the DLNR administrator with the authority to issue permits. [Id., Exh. F, Exh. G at 8-10.]  Instead, it was signed by a low-level planning officer. Further, Defendants argue that the transfers from Mr. Bebee ultimately to Plaintiff were completed without the proper notices to and approval of DLNR.  Defendants note that in March 2010, Plaintiff sought a revision of the Permit to replace the monohull vessel, the Big Kahuna, as the permitted vessel, but DOBOR never executed the revised Permit. [Id., Exh. H]  Defendants also point out that Plaintiff never conducted commercial tours using either the Alii Nui or the Big Kahuna, and Defendants argue that it is not clear that Plaintiff ever owned either of those vessels.  Defendants emphasize that the December 2009 Permit expired and a new permit was issued in March 2010.

Defendants emphasize that Plaintiff's Motion seeks a mandatory injunction, and therefore a heightened showing is required.  Defendants argue that Plaintiff is not likely to prevail on the merits because: Plaintiff has no property interest in substituting vessels on the Permit; its equal protection claim is not viable; and the state law claims fail because the two individual capacity defendants have qualified immunity.  In

7

addition, Defendants contend there is no irreparable injury because Plaintiff has only suffered monetary losses and there is no indication that Plaintiff cannot operate the Queen's Treasure elsewhere.  Finally, the public interest does not favor an injunction because the public has an interest in the orderly management of commercial boating in the area, and there have

already been complaints about Plaintiff trying to bypass the catamaran waiting list.

In its reply, Plaintiff first notes that the memorandum in opposition does not comply with the Local Rules.  Plaintiff emphasizes that the Permit specifies the use of a monohull/multihull vessel and is for the carriage of forty-nine passengers, which the QT is not capable of.  Plaintiff therefore contends that in granting the Permit, DLNR contemplated the use of one or more vessels on the Permit, and the addition of vessels to the Permit does not require DLNR approval.  Further, Plaintiff alleges that DLNR knew Plaintiff was having the Queen's Treasure built.  Plaintiff also argues that DLNR has allowed changes to the vessel on the Permit in the past, and the wait list is not applicable because this was a renewal of a permit and not an issuance of a new permit.  As to the minimum revenues standard, Plaintiff notes that there is an alternative under Haw. Admin. R. § 13-231-61(a)(2)(D), which is applicable in this case.  As to

8

the argument that the person who signed the December 2009 Permit did not have authority to do so, Plaintiff argues that the person's allegedly unauthorized actions were subsequently ratified by DLNR.

Plaintiff argues that it is not seeking a mandatory injunction because it is Defendants that want to change the status quo by preventing Plaintiff from using the Permit as Plaintiff is entitled to do.  Plaintiff reiterates that it has a protectable property right in the Permit, and it argues that Defendants did not properly address Plaintiff's due process argument.  Plaintiff clarifies that it does not seek the preliminary injunction based on its equal protection claim.  As to the qualified immunity argument, Plaintiff contends that it has alleged sufficient facts to show that immunity does not apply in this case.  Plaintiff emphasizes that irreparable harm is presumed because Defendants deprived Plaintiff of its constitutional rights.  Further, Plaintiff's impending bankruptcy is more than a financial loss; it involves a loss of hard work, planning, goodwill, and the opportunity to make a lifelong dream a reality.  Finally, as to the public interest, Plaintiff contends that the public has an interest in transparency and consistency in the permitting process and in preventing the government from violating constitutional rights.

**STANDARD**

In _Winter v. Natural Resources Defense Council, Inc._,
the United States Supreme Court explained that "[a] plaintiff
seeking a preliminary injunction must establish that he is likely
to succeed on the merits, that he is likely to suffer irreparable
harm in the absence of preliminary relief, that the balance of
equities tips in his favor, and that an injunction is in the
public interest."  555 U.S. 7, 20 (2008) (citations omitted).
The Ninth Circuit has held that its serious questions test, under
which a district could issue a preliminary injunction "where the
likelihood of success is such that serious questions going to the
merits were raised and the balance of hardships tips sharply in
[plaintiff's] favor[,]" survives _Winter_ as long as courts
applying the test incorporate it into the four-part _Winter_
analysis.  _Alliance for the Wild Rockies v. Cottrell_, 632 F.3d
1127, 1131 (9th Cir. 2011) (citation and quotation marks omitted)
(some alterations in original).  "In other words, 'serious
questions going to the merits' and a hardship balance that tips
sharply toward the plaintiff can support issuance of an
injunction, assuming the other two elements of the _Winter_ test
are also met."  _Id._ at 1132.

**DISCUSSION**

I.   **Likelihood of Success on the Merits**

The Court first addresses Plaintiff's likelihood of

10

success on the merits of its due process claim and state law claims.[2]

A.  **Due Process Claim**

"To succeed on a substantive or procedural due process claim, the plaintiffs must first establish that they were deprived of an interest protected by the Due Process Clause." Johnson v. Rancho Santiago Cmty. Coll. Dist., 623 F.3d 1011, 1029 (9th Cir. 2010) (citing Shanks v. Dressel, 540 F.3d 1082, 1087 (9th Cir. 2008) (substantive due process); Kildare v. Saenz, 325 F.3d 1078, 1085 (9th Cir. 2003) (procedural due process)).

> Protected property interests "are not created by the Constitution[, but r]ather . . . they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." [Bd. of Regents v.] Roth, 408 U.S. [564,] 577 [(1972)]. State law creates a property interest protected by the Due Process Clause where it creates a "legitimate claim of entitlement" to a particular benefit. Id. A legitimate claim of entitlement "is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms." Wedges/Ledges of Cal., Inc. v. Phoenix, 24 F.3d 56, 62 (9th Cir. 1994) (quoting Ass'n of Orange Co. Deputy Sheriffs v. Gates, 716 F.2d 733, 734 (9th Cir. 1983)).

Id. at 1030.

----

[2] The Court notes that Plaintiff is not asserting a likelihood of success on the merits of its equal protection claim. [Reply at 10 (noting that Defendants "focused on Plaintiff's equal protection claim which Plaintiff did not raise in Plaintiff's Motion because of a belief that discovery will uncover additional evidence of the acts and/or omissions of Defendants that were discriminatory.").]

Thus, it is possible to have a constitutionally protected property interest in a government-issued license or permit. <u>Gerhart v. Lake Cnty., Mont.</u>, 637 F.3d 1013, 1019 (9th Cir. 2011) (citing <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); <u>Groten v. California</u>, 251 F.3d 844, 850 (9th Cir. 2001) (holding that plaintiff had a protected property right to a temporary appraiser's license)). In order to have "a legitimate claim of entitlement", however, the person seeking the license or permit cannot have just "an abstract need or desire" or "a unilateral expectation of it." <u>Roth</u>, 408 U.S. at 577. The Ninth Circuit has held that

> state law creates a "legitimate claim of entitlement" when it "imposes significant limitations on the discretion of the decision maker." <u>Braswell [v. Shoreline Fire Dep't]</u>, 622 F.3d [1099,] 1102 [(9th Cir. 2010)] (internal quotation marks and alterations omitted). For example, we have held that such an entitlement to a government permit exists when a state law or regulation requires that the permit be issued once certain requirements are satisfied. <u>See, e.g.</u>, <u>Groten</u>, 251 F.3d at 850 (holding that a protected property right to a license existed where both federal and state law entitled the applicant to a license whenever certain statutory requirements were met); <u>Bateson v. Geisse</u>, 857 F.2d 1300, 1303 (9th Cir. 1988) (holding that a builder had a property interest in a building permit where city regulations provided that once an applicant met certain requirements, a permit must be issued).

<u>Gerhart</u>, 637 F.3d at 1019-20.

First, the Court emphasizes that the alleged property

interest at issue in this case is not Plaintiff's right to renew
the Permit, but rather Plaintiff's right to operate the Queen's
Treasure under the Permit.  The "Primary Vessel" identified on
the March 2011 Permit is the "QT".  [Frame Aff., Exh. G at 1.]
Plaintiff has not presented any evidence that Defendants have
prevented Plaintiff from operating the QT according to the terms
of the Permit or that Defendants have denied Plaintiff's request
to renew the Permit to operate the QT.  What Plaintiff alleges is
that it has an entitlement to substitute the Queen's Treasure for
the QT or add the Queen's Treasure to the inventory of vessels on
the March 2011 Permit.  As evidence of this entitlement,
Plaintiff relies primarily on the language of the Permit and the
March 12, 2010 letter from DOBOR approving the transfer of the
ownership interest in Plaintiff to Janice Noland and
Amy Sutherland ("3/12/10 Letter").  [Id., Exh. D.]

The 3/12/10 Letter states, in pertinent part:

> All permit terms shall remain as attached
> including but not limited to the ability of
> Permittee to utilize either a Monohull or
> Multihull vessel, as well as Passenger Carriage
> for up to 115.  It is understood that the vessel
> "Alii Nui" Reg Doc 567359 will remain as the
> vessel of record until which time Permittee will
> change the vessel of record to the operating
> vessel, such that this change of vessel shall take
> place no later than 6 months after the closing.

[Frame Aff., Exh. D.]  Nothing in the 3/12/10 Letter, however,
indicates that Plaintiff had the right to freely change the
vessel of record on the Permit throughout the duration of the

13

Permit.  The letter merely evidences that DOBOR acknowledged that
there would be one change in the vessel of record, within six
months after Plaintiff's transfer of interest.  The 3/12/10
Letter does not constitute evidence that Plaintiff had a
legitimate claim of entitlement to make the Queen's Treasure the
vessel of record in 2011.

        As to the terms of the Permit, the March 2011 Permit
authorizes Plaintiff "to conduct PASSENGER CARRIAGE (49 Pax,
Monohull/Multihull)."  [Frame Aff., Exh. G at 1.]  The terms
include that:

            7.   The Permittee agrees to notify the Department
                 in writing of any changes concerning
                 ownership, address, vessel inventory or
                 operator(s) of a vessel(s) within 7 days of
                 the date of change.
            . . . .
            9.   The permit fee applies to the commercial
                 operation, activities, or uses specifically
                 allowed under this permit.  Any operation,
                 activity, or use not specifically allowed
                 must be requested and approved separately.

[Id., Exh. G at 2.]  The December 2009 Permit and the March 2010
Permit include the same language.  [Id., Exh. A at 1-2, Exh. F at
1-2.]  The December 2009 Permit lists the Alii Nui as the Primary
Vessel; the March 2010 Permit lists the Big Kahuna as the Primary
Vessel; and the March 2011 Permit lists the QT as the Primary
Vessel.  [Id., Exh. A at 1, Exh. F at 1, Exh. G at 1.]  The Alii
Nui is a catamaran.  [Motion, Decl. of Janice Nolan ("Nolan

Decl."), at ¶ 4.]   The Big Kahuna is also catamaran.   [Frame Aff., Exh. R at 1.]   The QT is a fourteen-foot inflatable monohull vessel.   [Reply at 3.]

Plaintiff alleges that, in light of the history of the vessel changes on the Permit and the fact that the two vessels of record prior to the QT were catamarans, Plaintiff had the right to substitute/add a catamaran - the Queen's Treasure - to the inventory of vessels covered by the Permit.   Further, Plaintiff submits a July 27, 2011 letter to Defendant Underwood from Plaintiff's counsel stating, *inter alia*, that:

> When DLNR issued permit number M-05 for the third time on March 22, 2011 it did so knowing full well the designated primary vessel QT [,]an abbreviation for QUEEN'S TREASURE, a tender vessel, was designated only until such time as QUEEN'S TREASURE's construction was complete and she was sailed to Maui to be substituted on the permit and commence commercial operations.

[Frame Aff., Exh. R at 1.]   These facts, however, do not establish a legitimate claim of entitlement to the substitution/addition of the Queen's Treasure, such that the applicable state laws and regulations required that Defendants allow the substitution/addition.

There are many irregularities in the Permit and its history.   These irregularities include, *inter alia*: DOBOR's regulations for the Kaanapali area, Haw. Admin. R. Title 13, Chapter 251, do not provide for a registration permit for a monohull/multihull vessel; Plaintiff's December 2009 Permit was

apparently expired when the March 2010 Permit was issued; and both the March 2010 Permit and the March 2011 Permit contain blank signature lines under the heading "ISSUED".[3] Defendants have also raised questions regarding: whether Plaintiff actually owned the vessels listed in the December 2009 Permit and the March 2010 Permit; whether Plaintiff met the requirements to maintain the Permit; and whether the transfer of ownership of Plaintiff complied with the applicable regulations.  These issues suggest that at one or more points in its history, the Permit was issued in error.  Haw. Admin. R. § 13-251-49(a) states, *inter alia*:

> (a) The department may suspend or revoke the registration of a vessel, surfboard, sailboard, or water sports equipment whenever:
>> (1)   The department is satisfied that the registration was fraudulently or erroneously issued[.]

---

[3] The last page of each of the two permits states:

> ISSUED:
>
> STATE OF HAWAII
> DEPARTMENT OF LAND AND NATURAL
> RESOURCES, DIVISION OF BOATING AND
> OCEAN RECREATION
>
> BY: _____
>      Edward R. Underwood, Administrator
> Division of Boating & Ocean Recreation
>
> DATE: _____

[Frame Aff., Exh. F at 4, Exh. G at 4.]  These lines are blank on both the March 2010 Permit and the March 2011 Permit.

Thus, if Defendants determined that the Permit had been issued in error, DOBOR's regulations did not require Defendants to continue the errors by honoring erroneous terms in the Permit.  Instead, DLNR/DOBOR had the authority to suspend or revoke the Permit.  To the extent that the terms of the Permit were inconsistent with the procedures under the applicable law, Plaintiff was on notice that it could not rely on those inconsistent terms as superceding the applicable statutes or regulations.  The March 2011 Permit stated:

> 16.  The Permittee understands and agrees that nothing stated herein is intended to limit the provisions of applicable federal, state, or county laws, including but not limited to rules and regulations, and understands and agrees that all such laws apply to the Permittee and this permit.

[Frame Aff., Exh. G at 3.]  The March 2010 Permit includes the same language.  [Id., Exh. F at 3.]

The Court therefore FINDS that Plaintiff has not shown that it had a legitimate claim of entitlement to substitute/add the Queen's Treasure to the inventory of vessels on the Permit. Thus, Plaintiff has not established a likelihood of success on the merits of its due process claim.

**B.  State Law Claims**

Plaintiff also argues that it is likely to succeed on the merits of its state law claims, equitable estoppel, negligence, and intentional interference with prospective

17

business advantage.   Defendants have raised the issue of

qualified immunity, but the Court need not address that issue,

because even if Plaintiff has named the proper Defendants in

these claims, Plaintiff has still failed to establish a

likelihood of success on the merits.

      1.   **Promissory Estoppel**

      Under Hawai`i law, there are four elements of a

promissory estoppel claim:

> (1) There must be a promise;
> (2) The promisor must, at the time he or she made
>     the promise, foresee that the promisee would
>     rely upon the promise (foreseeability);
> (3) The promisee does in fact rely upon the
>     promisor's promise; and
> (4) Enforcement of the promise is necessary to
>     avoid injustice.

Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd., 100 Hawai`i 149,

164-65, 58 P.3d 1196, 1211-12 (2002) (citation omitted).

Plaintiff has not presented any evidence that Defendants promised

Plaintiff that it could operate the Queen's Treasure under the

March 2011 Permit.   Plaintiff merely assumed that the

substitution/addition of the Queen's Treasure would be allowed

based on the history of the Permit.   The Court therefore FINDS

that Plaintiff has not established a likelihood of success on the

merits of its promissory estoppel claim.

      2.   **Negligence**

      The elements of a negligence claim under Hawai`i law

are: "(1) duty; (2) breach of duty; (3) causation; and (4)

damages." <u>Cho v. Hawai`i</u>, 115 Hawai`i 373, 379 n.11, 168 P.3d 17, 23 n.11 (2007).  Hawai`i law recognizes a general duty requiring government employees to carry out their official duties as prescribed by the applicable laws and rules and in the exercise of due care.  <u>See, e.g.</u>, <u>Upchurch v. State</u>, 51 Haw. 150, 154, 454 P.2d 112, 115 (1969) ("[I]f the acts of negligence alleged and proven were the failure of employees to carry out their duties as prescribed by the rules, or their failure to exercise due care in the performance of their duties, such acts or omissions would . . . be actionable under the State Tort Liability Act.").  Defendants admit that there were irregularities in the history of the Permit.  Plaintiff argues that these irregularities caused it to incur damages by commissioning the Queen's Treasure, and Defendants are liable for those damages because they have not permitted Plaintiff to operate the Queen's Treasure under the Permit.  However, for the reasons stated in the discussion of Plaintiff's alleged protectable property interest, Plaintiff's reliance on the irregularities in the permitting process was not reasonable.  Plaintiff has not established a likelihood of proving the causation element.  The Court therefore FINDS that Plaintiff has not established a likelihood of success on the merits of its negligence claim.

### 3.   <u>Interference with Prospective Business Advantage</u>

Based in part on Restatement (Second) of Torts § 766B, the Hawai`i Supreme Court has identified the following elements of the tort of intentional interference with prospective business advantage:

> (1) the existence of a valid business relationship
> or a prospective advantage or expectancy
> sufficiently definite, specific, and capable of
> acceptance in the sense that there is a reasonable
> probability of it maturing into a future economic
> benefit to the plaintiff; (2) knowledge of the
> relationship, advantage, or expectancy by the
> defendant; (3) a purposeful intent to interfere
> with the relationship, advantage, or expectancy;
> (4) legal causation between the act of
> interference and the impairment of the
> relationship, advantage, or expectancy; and (5)
> actual damages.

<u>Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc.</u>, 113 Hawai`i 77, 116 148 P.3d 1179, 1218 (2006) (citations omitted).

Plaintiff has not identified a valid business relationship that it had and that Defendants allegedly interfered with.  Plaintiff has merely stated that it "has lost an opportunity to contract with another permit holder to handle their passengers while their vessel is in drydock from October 14, 2011 to November 14, 2011."  [Mem. in Supp. of Motion at 27-28 (citing Nolan Decl.).]  Plaintiff alleges that it has a prospective advantage or expectancy because "[a]s a new vessel, it has an advantage over older vessels both in terms of maintenance and cosmetic appeal."  [<u>Id.</u> at 21 (citing Nolan

Decl.).] Plaintiff's assumption is not sufficiently definite, specific, and capable of acceptance to support an intentional interference with prospective business advantage claim. Insofar as Plaintiff has not shown that it can establish the first element of its intentional interference with prospective business advantage claim, the Court FINDS that Plaintiff has not established a likelihood of success on the merits of Count VII.

## II. **Irreparable Harm**

Plaintiff relies first on the rule that irreparable harm is presumed when a plaintiff alleging a civil rights violation establishes a likelihood of success on the merits. [Mem. in Supp. of Motion at 27 (citations omitted).] It is true that, "[u]nlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." Nelson v. NASA, 530 F.3d 865, 882 (9th Cir. 2008), reversed on other grounds, 131 S. Ct. 746 (2011). This Court, however, has recognized that, where a plaintiff fails to establish a likelihood of success on the merits of its civil rights claim, without more, the Court should not presume irreparable harm. Am. Promotional Events, Inc.--Nw. v. City & Cnty. of Honolulu, 796 F. Supp. 2d 1261, 1283 (D. Hawai`i 2011).

Plaintiff also argues that it is likely to suffer irreparable harm in the absence of a preliminary injunction

because it has suffered, and continues to suffer, substantial financial losses and it will soon be forced to go out of business.  [Mem. in Supp. of Motion at 27 (citing Frame Aff., Exh. K (Pltf.'s Balance Sheet); Nolan Decl.).]  Typically, monetary harm does not constitute irreparable harm.  <u>Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League</u>, 634 F.2d 1197, 1202 (9th Cir. 1980).  This is so because "economic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award."  <u>Cal. Pharmacists Ass'n v. Maxwell-Jolly</u>, 563 F.3d 847, 852 (9th Cir. 2009).  Injuries to goodwill and business reputation, however, are generally considered to be intangible and, as a result, irreparable.  <u>See, e.g.</u>, <u>Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.</u>, 944 F.2d 597, 603 (9th Cir. 1991) ("[W]e have also recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."); <u>MySpace, Inc. v. Wallace</u>, 498 F. Supp. 2d 1293, 1305 (C.D. Cal. 2007) ("Harm to business goodwill and reputation is unquantifiable and considered irreparable.").  Plaintiff, however, has not been in active operation and therefore it arguably does not have goodwill and reputation to lose if it is forced to go out of business.  Further, Plaintiff has not established that it would be unable either to operate the Queen's

22

Treasure elsewhere or to avoid going out of business by selling or leasing the Queen's Treasure.

The Court therefore FINDS that Plaintiff has not established it is likely to suffer irreparable harm in the absence of a preliminary injunction.

## III. **Balance of the Equities**

"To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." <u>Univ. of Hawai`i Prof'l Assembly v. Cayetano</u>, 183 F.3d 1096, 1108 (9th Cir. 1999).  As noted in the analysis of the irreparable harm factor, the primary hardships that Plaintiff would suffer if the Court denies the injunction would be economic losses and potential insolvency.  These are certainly major and significant harms.  Plaintiff itself acknowledges that "Defendants have a legitimate interest in managing and administering DLNR/DOBOR's permit scheme[.]"  [Mem. in Supp. of Motion at 28.]  Plaintiff, however, contends that Defendants "will suffer no hardship or incur any substantial costs if Plaintiff is allowed to operate QUEEN'S TREASURE under Plaintiff's Permit No. M-05."  [<u>Id.</u>]  The Court disagrees. Defendants have presented evidence that DOBOR has received complaints about Plaintiff's potential operation of the Queen's Treasure under the Permit because of the problems in the Permit's

23

history and because allowing Plaintiff to operate the Queen's Treasure would be allowing Ms. Nolan to bypass those ahead of her on the Kaanapali catamaran waiting list. [Morris Aff., Exh. J (letter dated 5/20/11 to Mr. William J. Aila, Jr., Chairperson, DLNR/DOBOR from Dean H. Robb, Esq.), Exh. K (letter dated 12/2/11 to Mr. Edward R. Underwood from counsel for Kapalua Kai Sailing, Inc. and its principals).]  Kapalua Kai Sailing, Inc., and its principals, have a Kaanapali catamaran permit and are second in line on the Kaanapali catamaran waiting list. [Id., Exh. K at 1.]  They accuse DOBOR of holding "lawful permit holders to one standard of conduct" and Plaintiff to another, and they state that they "are committed and prepared to take legal as (sic) necessary to ensure their rights are protected and DOBOR fulfills its duty to the general public to implement, execute and enforce the relevant administrative rules in a fair and impartial manner." [Id. at 3-4.]  Thus, allowing Plaintiff to operate the Queen's Treasure under the Permit may subject Defendants to further litigation by other persons and entities who claim a superior entitlement to a Kaanapali catamaran permit than Plaintiff's as well as undermine the integrity and purpose of the permit waiting list.

The Court therefore FINDS that the balance of the equities is, at best, neutral.  It weighs neither in favor nor against the issuance of a preliminary injunction.

24

IV.  **Public Interest**

This Court has recognized the following principles relevant to the public interest inquiry:

> The plaintiffs bear the initial burden of showing that the injunction is in the public interest.  See Winter [v. Natural Resources Defense Council, Inc.], [555 U.S. 7,] 129 S. Ct. [365,] 378 [(2008)].  However, the district court need not consider public consequences that are "highly speculative." In other words, the court should weigh the public interest in light of the likely consequences of the injunction.  Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence.
> Finally, the district court should give due weight to the serious consideration of the public interest in this case that has already been undertaken by the responsible state officials . . . who unanimously passed the rules that are the subject of this appeal.  See Golden Gate Rest. Ass'n [v. City and County of San Francisco], 512 F.3d [1112] at 1127 [(9th Cir. 2008)] ("The public interest may be declared in the form of a statute." (internal quotation marks omitted)); see also Burford v. Sun Oil Co., 319 U.S. 315, 318, 63 S. Ct. 1098, 87 L. Ed. 1424 (1943) ("[I]t is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." (internal quotation marks omitted)).

Stormans, Inc. v. Selecky, 586 F.3d 1109, 1139-40 (9th Cir. 2009) (some citations and quotation marks omitted).  The public interest inquiry primarily addresses the impact on non-parties rather than parties.

Am. Promotional Events, 796 F. Supp. 2d at 1284-85 (alterations in Am. Promotional Events).

In the present case, Plaintiff argues that an injunction is in the public interest because: Plaintiff's receipts from the operation of the Queen's Treasure will generate fee and tax revenue for the State; allowing Plaintiff to operate the Queen's Treasure will mitigate its damages and decrease the damages Plaintiff may recover from Defendants; and allowing Plaintiff to operate the Queen's Treasure will foster "a healthy business climate in a challenging economy and encourage public investment in similar opportunities." [Mem. in Supp. of Motion at 29.] Plaintiff also emphasizes that the public has an interest in ensuring that government officials do not violate the due process rights of Plaintiff and of other members of the public involved in the boating industry. [Id. at 30.]

Plaintiff's potential revenue and the reduction of Defendants' potential liability are effects on the parties, which is not the Court's primary concern in the public interest inquiry. While it is true that the public does have an interest in ensuring that a state government does not violate its citizens' constitutional rights, the same could be said in every case alleging constitutional violations against state defendants, which is inconsistent with the fact that a preliminary injunction is considered an extraordinary remedy. See Winter, 555 U.S. at 24. Moreover, this Court declines to consider that aspect of the public interest because this Court has found that Plaintiff has

26

not established a likelihood of success on the merits of its due process claim.  Finally, the Court disagrees with Plaintiff's argument that allowing Plaintiff to operate the Queen's Treasure under the Permit would promote the operation of, and investment in, local businesses in general.  The parties recognize that there were irregularities in the history of the Permit. Plaintiff contends that, under constitutional theories and state law theories, those irregularities entitle Plaintiff to operate the Queen's Treasure under the Permit.  The facts of this case are unique and granting an injunction is not likely to encourage business development and investment in general.

The Court therefore FINDS that Plaintiff has not established that the issuance of a preliminary injunction would be in the public interest.

**V.    Summary of Factors**

Having considered all of the relevant factors, this Court CONCLUDES that, under either the <u>Winter</u> test alone or the serious questions analysis within the <u>Winter</u> test, Plaintiff has not established that it is entitled to a preliminary injunction.

**CONCLUSION**

On the basis of the foregoing, Plaintiff's Motion for Preliminary Injunction, filed September 30, 2011, is HEREBY DENIED.

IT IS SO ORDERED.

27

DATED AT HONOLULU, HAWAII, January 31, 2012.



   /S/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**KAANAPALI TOURS, LLC V. STATE OF HAWAI`I DEPARTMENT OF LAND & NATURAL RESOURCES, ET AL; CIVIL NO. 11-00555 LEK-RLP; ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**